IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)


FLEECS V. BURNETT


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


GREG FLEECS, INDIVIDUALLY AND AS TRUSTEE OF THE
GREG FLEECS REVOCABLE TRUST, APPELLEE,

V.

CLIFFORD W. BURNETT, APPELLANT, AND DALE LIND, INDIVIDUALLY
AND AS TRUSTEE OF THE LONGHORN IRREVOCABLE
TRUST, INTERVENOR AND APPELLEE.


Filed December 5, 2023.    Nos. A-22-957, A-22-958.


Appeals from the District Court for Custer County: KARIN L. NOAKES, Judge. Affirmed.

Terry K. Barber, of Barber & Barber, P.C., L.L.O., for appellant.

Vikki S. Stamm and Rebecca M. Riley, of Stamm Romero & Associates, P.C., L.L.O., for appellee Greg Fleecs.

Matthew D. Furrow and Michael S. Borders, of Borders Law Office, for intervenor and appellee Dale Lind.


PIRTLE, Chief Judge, and MOORE and ARTERBURN, Judges.

MOORE, Judge.

## I. INTRODUCTION

These cases involve Clifford W. Burnett's alleged breach of agister's agreements with Greg Fleecs and Dale Lind, and the validity of Uniform Commercial Code (UCC) financing statements filed by Fleecs and Burnett. Following a bench trial, the district court of Custer County found that Burnett had breached his agreements with both Fleecs and Lind by failing to properly care for their

- 1 -

cattle and failing to provide proof of losses due to death. The district court also found that neither Fleecs nor Burnett were entitled to file a UCC financing statement. We affirm.

## II. STATEMENT OF FACTS

### 1. PROCEDURAL HISTORY

For many years, Burnett had agreements with Fleecs, and separately with Lind, to feed and care for their cows in return for a share of their calf crop. Communication between Fleecs and Burnett broke down in the summer of 2018. Fleecs was concerned that Burnett was not branding the cattle belonging to Fleecs according to the parties' agister's agreements.

On August 24, 2018, Fleecs filed a UCC financing statement with the Nebraska Secretary of State, placing a bailor's lien against Burnett and Burnett's LV Ranch, as debtors. The financing statement covered all of Fleecs' livestock and proceeds in Burnett's possession including, "342 black and black white-faced cows with calves at their side, 79 black and black white-faced cows with first calves at side, 69 black and black white-faced cows with second calves at their side and 88 black and black white-faced bred heifers," which may be branded with three brands: two of Fleecs' own brands and Burnett's LV brand.

On April 29, 2019, Burnett filed a UCC financing statement with the Nebraska Secretary of State, placing an agricultural agister's lien against Fleecs in the amount of $906,400 for the care and feeding of Fleecs' cattle. The cows covered by Burnett's agister's lien were the same as those Fleecs listed in his own financing statement, though Burnett added "100 young ones."

On June 26, 2019, Fleecs filed a complaint in the district court of Lancaster County, seeking a determination of the validity of his and Burnett's UCC financing statements. The complaint also alleged that Burnett had breached his agister's agreements with Fleecs by encumbering the livestock included in the agreements. The action was later transferred to Custer County district court.

Burnett filed an answer and counterclaim, alleging slander of title. The counterclaim also sought a declaratory judgment from the district court declaring Fleecs' financing statement to be invalid and illegal, terminating the parties' agister's agreements, and awarding Burnett $906,400 in damages for the care and feeding of Fleecs' cattle.

Fleecs filed a reply to Burnett's answer and counterclaim, in which he requested that the district court order a cow head count, an accounting from Burnett as to any discrepancies, and that Burnett execute a brand release for any cows belonging to Fleecs but bearing Burnett's brand.

Various motions were thereafter filed regarding the validity of the UCC financing statements and Burnett's effort to terminate Fleecs' financing statement, which we need not detail as the issue of the financing statements will be addressed below in connection with the district court's final judgment.

On March 2, 2020, Fleecs filed a separate replevin action against Burnett in the district court of Custer County. On March 5, the district court filed a temporary order related to Fleecs' replevin action, and referenced Fleecs' amended complaint, affidavit, and request for delivery, all of which do not appear in our record on appeal. The court noted that Fleecs' request for delivery of specific personal property was described in his affidavit as 390 share cows, bred; 79 second calf heifers, bred; 88 first calf heifers, bred; and 117 heifer calves born in 2019. Although this particular affidavit is not in our record, Fleecs' accounting of his cattle in this instance is identical to that

which he set forth in his affidavit dated October 30, 2019, relating to the validity of Burnett's termination statement; as well as his affidavit dated January 13, 2020, relating to a motion for a court-ordered inspection. The court ordered Burnett to hold the described property in his possession until further order of the court.

A hearing on Fleecs' request for delivery was held on March 19, 2020, though a transcript from the hearing is not included in our record. On March 24, the district court entered an order memorializing the hearing, stating that the parties had reached an agreement. Burnett agreed to deliver to Fleecs all cattle bearing Fleecs' brand in addition to four to five cows which bared no brand but had ear tags indicating they are Fleecs' property. In total Fleecs would be delivered 30-40 cows. The court found this agreement to be reasonable and ordered Burnett to deliver the cows as soon as practicable. The court also noted that it would hold in abeyance its ruling on the remaining property included in Fleecs' request for delivery.

On May 15, 2020, Fleecs filed an amended UCC financing statement with the Secretary of State which excluded male cattle with the LV brand from Fleecs' bailor's lien.

At some point in the action regarding the UCC financing statements, Lind intervened, though the exact date of his intervention is not clear from our record. On October 27, 2020, Lind filed a motion requesting that the district court order Burnett to release Lind's 2020 calf share pursuant to the lease agreement between Burnett and Lind. The motion alleged that Lind had been attempting to remove his 2020 calf share, but that Burnett had been uncooperative, despite all parties' agreeing that Lind should receive 16 calves from the 2020 calf share of Lind's cows. A hearing on the matter was held on November 5 where Burnett argued that Lind should receive 14 calves. Lind agreed to an order allowing him to receive 14 calves while reserving the right to argue his entitlement to the other two calves at trial. On November 10, the district court entered an order which referenced the agreement that Lind would receive 14 calves from his 2020 calf crop and ordered Burnett to produce those 14 calves for Lind.

On December 11, 2020, in the replevin action, Burnett filed a motion for order for delivery and payment for care, which listed Custer Federal State Bank as an intervenor. The motion alleged that pursuant to previous court orders, on March 21, Fleecs had retrieved 38 cows and four calves from Burnett, and on April 17, Fleecs had retrieved six cows and three calves from Burnett. The motion further alleged that there remained eight of Fleecs' heifers in Burnett's care, which Burnett would provide to Fleecs subject to payment for care and feeding. Fleecs had refused to take possession of the eight heifers because of Burnett's request for payment. The motion requested that the district court determine Burnett's right to compensation for the care and feeding of the eight heifers, order Burnett to convey possession of the heifers to Fleecs, and issue a final determination that there remains no additional livestock to which Fleecs, or his trust, are entitled. The court denied this motion in its final judgment.

Also on December 11, 2020, in the action arising from the UCC financing statements, Burnett filed a motion for leave to amend his answer and counterclaim, which he attached to his motion. The amended counterclaim alleged an additional claim against Fleecs of tortious interference with a business relationship based upon his relationship with Lind, Lind's trust, and Custer Federal State Bank. However, the record does not contain any ruling on this motion and the amended answer and counterclaim was not filed.

At some point in the proceedings, Burnett's trial counsel presumably withdrew as Burnett, self-represented, filed a motion for partial summary judgment on January 26, 2022. Burnett alleged that Fleecs removed all cattle which were his to remove from Burnett's property and all the other cattle belonging to Fleecs had been sold. Burnett alleged that therefore Fleecs could no longer have a lien. A hearing on Burnett's motion for partial summary judgment was held on March 31, 2022, wherein the district court took the matter under advisement. An order relating to Burnett's motion for summary judgment does not appear in our record on appeal.

## 2. TRIAL

A consolidated bench trial was held on the validity of UCC financing statements, the breach of contract claim, and the replevin claim over the course of 3 days in August 2022. Burnett represented himself at the trial. The following evidence was adduced. Additional details of the trial evidence are referenced as necessary in our analysis.

### (a) Fleecs and Burnett Agreements

Two contracts existed between Fleecs and Burnett. These agister's agreements were referred to as the "share cow agreement" and the "heifer calf agreement."

The share cow agreement was dated January 17, 2009, and signed by Fleecs and Burnett on March 10, 2009. The agreement was automatically renewed for 1 year if neither party had notice of termination within 60 days of the agreement's expiration. Under the share cow agreement, Burnett was to pay "all property taxes, trucking expenses both ways, veterinarian fees and expenses, inspection fees, insurance premiums, equipment expense, feed expense, salt and mineral expense, and all other expenses necessary to properly breed, graze, pasture, feed, maintain, care for and raise said livestock . . ." In exchange, Burnett would receive a percentage of calves born to Fleecs' cows. Though the original cow share agreement stated that Burnett was to receive 75 percent of the heifer calves born to the share cows, in November 2010 the parties agreed that Burnett was to receive 70 percent of the heifer calves born to the share cows, with the remaining 30 percent going to Fleecs. Under the heifer calf agreement, dated January 19, 2012, Fleecs' heifer calves would remain under Burnett's care until January 19, 2015, and Burnett would receive 100 percent of the first two calf crops.

Fleecs and Burnett met annually to discuss and agree on the numbers of cows Fleecs had in Burnett's herd. Beginning in 2010, Fleecs kept a notebook documenting the number. Each year the new heifer calves aged into the first calf heifers, the first calf heifers aged into second calf heifers, and second calf heifers aged into share cows. Fleecs documented these cows, as well as the number of cows that died (as reported by Burnett) and those that were sold for various reasons. At the conclusion of the annual meeting, both Fleecs and Burnett would sign the notebook to indicate that they had reached an agreement on the cattle numbers.

The share cow agreement required Burnett to brand all heifer calves in the spring season on their right side with Fleecs' brand. Fleecs provided Burnett with a branding iron when he first brought his cows over to Burnett's property. Upon division of the calves as provided by the agreement, Burnett would receive a brand release from Fleecs for the calves Burnett was to keep. The heifer calf agreement included no requirement that Burnett brand those calves with Fleecs' brand as Burnett was to receive 100 percent of the first two calf crops.

Burnett conceded at trial that he failed to brand Fleecs' cows with Fleecs' brand beginning in approximately 2014. He admits he began branding all the cows in the herd with his LV brand, including Fleecs' cows. When Fleecs became aware of this, he asked Burnett to rebrand his cattle with the Fleecs brand, but Burnett did not comply. Both Burnett and Fleecs agree that Burnett communicated that the iron brand which Fleecs had initially provided had worn out, however they disagree as to when this communication occurred. Burnett testified that several years passed before Fleecs provided him with another brand in 2017, while Fleecs testified that he purchased a replacement iron in 2017, shortly after Burnett made Fleecs aware that the previous iron had worn out. A December 2017 order form for an electric branding iron was entered into evidence and demonstrates that the brand was ordered by Fleecs with instructions to ship the brand directly to Burnett.

Both the share cow agreement and heifer calf agreement stated that in the event death or loss arises from the fault, neglect, or improper care by Burnett, he must make a just remuneration or replacement to Fleecs on or before the termination of the agreement. The agreements also required that Burnett prove all death loss of Fleecs' cows by cutting the brand off the dead cow and presenting it to Fleecs or by a certificate from the rendering company stating the brand of the dead animal.

Fleecs testified that Burnett would typically send Fleecs a printed photograph of a dead cow to inform Fleecs that the animal had died. Fleecs found this to be an acceptable procedure for proving death loss and began taking Burnett at his word when he reported a dead cow. Fleecs also testified that the percentage of death loss reported by Burnett over the course of the parties' agreement was never concerning to him when compared to Fleecs' whole herd.

The last annual meeting between Fleecs and Burnett occurred in March 2018. At that time, Burnett signed Fleecs' notebook acknowledging that Fleecs owned 342 share cows, 69 second calf heifers, 79 first calf heifers, and 88 heifer calves in his herd. The notebook also stated that in the past year, four cows had died from prolapse, one died from a hailstorm, and one died on December 1, 2017. Fleecs was unaware of the hailstorm until this conversation with Burnett in March 2018 and believed he had only lost one cow in the storm, as reported by Burnett. Fleecs could not recall ever receiving notice from Burnett that he had suffered large-scale losses due to severe weather.

In the summer of 2018, Fleecs wanted to inspect his bred heifers. Fleecs testified that though Burnett was supposed to have the cows "on hand," Burnett was unable to show them to Fleecs. Burnett told Fleecs they were in Colorado but would not provide Fleecs with the cattle's specific location as he wanted to accompany Fleecs to Colorado for the inspection. Despite repeated requests by Fleecs, Burnett never took Fleecs to Colorado to inspect his cattle.

Because Fleecs thought that Burnett had improperly sold some of his heifers, in August 2018, Fleecs filed his financing statement against Burnett, placing a bailor's lien on all of Fleecs' cattle in Burnett's possession with Burnett's LV brand. Fleecs stated he included the LV brand because Burnett had admitted to branding Fleecs' cattle with the LV brand.

In December 2018 Fleecs received a call from a sale barn in Broken Bow, Nebraska, informing Fleecs that Burnett was selling calves and inquiring as to whether Fleecs wanted his name on the proceeds check. Fleecs indicated that the sale barn should put his name on the heifer calves check but to leave his name off the steer calves check. Fleecs later modified his financing statement to exclude male cattle because Fleecs had not placed any male cattle into Burnett's care.

Burnett was upset seeing Fleecs' name on the heifer calf check and called Fleecs, who told Burnett that Fleecs would take his name off the check if Burnett would rebrand Fleecs' cattle. Fleecs contacted the sale barn and removed his name from the check, however Burnett never rebranded the Fleecs cattle.

A few weeks later, Fleecs and Burnett had another conversation regarding why Fleecs had filed his financing statement, including that Burnett was not rebranding Fleecs' cattle and that Fleecs believed his 88 head of bred heifers were missing because Burnett refused to show them to Fleecs. Burnett told Fleecs that the heifers were on Burnett's property and took Fleecs out to see the cows. Fleecs did observe some bred heifers amongst the cattle on Burnett's property, but not 88 head. Burnett indicated to Fleecs that the rest of the bred heifers were still in Colorado.

Upon observing some bred heifers in Burnett's possession, Fleecs planned to terminate his financing statement after Burnett rebranded his cattle. However, Burnett never provided verification of the branding, so Fleecs did not remove the lien. At the time of trial, Fleecs believed that he had observed Lind's heifers on Burnett's property instead of Fleecs' own.

Fleecs was surprised by Burnett's 2019 financing statement, which placed nearly a million-dollar agister's lien against Fleecs for care and feeding. Per the parties' written share cow agreement, Burnett was to pay for all of the cattle's feed and pasture in order to receive his 70 percent share. Burnett had never presented Fleecs with a bill for the expenses before including them in his 2019 financing statement. At some point in 2019, Fleecs notified Burnett that he was terminating their agreements.

During the case, Fleecs had requested that the district court allow an inspection of the cattle in Burnett's possession. However, the court-ordered inspections did not occur on the scheduled days, first because Burnett became ill and second because Burnett had filed for bankruptcy. Fleecs believed that Burnett filed for bankruptcy in an effort to halt the cow inspection. It was during Burnett's bankruptcy proceedings that Fleecs became aware that Burnett had several creditors, including Lind, as Burnett had always represented to Fleecs that he was self-funding his enterprise and did not have business with any bank.

In March 2020, Burnett stipulated to deliver 30 to 40 cows bearing Fleecs' brand and four to five cows bearing no brand but containing Fleecs' ear tag. On March 21, Fleecs picked up 38 cows and four baby calves from Burnett. A handwritten receipt for the cattle pick-up was signed by both Fleecs and Burnett.

A brand inspection finally occurred on March 30, 2020. An inspector's tally from the Nebraska Brand Committee reflects that Burnett was in possession of 59 cows with Lind's brand; 2 cows with Fleecs' brand; 170 cows, one calf and 13 bulls with the LV brand; three cows and 22 calves with no brand; one cow with three brands (Lind, Burnett, and Fleecs); and two cows carrying a non-party brand.

On April 17, 2020, Fleecs picked up an additional six cows and three baby calves from Burnett. A handwritten receipt for the cattle was signed by both Fleecs and Burnett. Fleecs believed he was still missing most of his cows that were in Burnett's care.

Burnett testified that a 2017 hailstorm and an April 2018 bomb cyclone caused a significant loss of cattle. Burnett stated that he "called the people, told them we . . . got hit pretty hard."

Burnett was missing some of his calving books in which he recorded the number of cattle in his care. Burnett stated that a disgruntled former employee took the calving books containing

the records relevant to the case. Without the calving books Burnett was unable to provide the exact number of cattle losses he experienced because of the weather conditions.

Burnett attempted to submit several photographs showing various single dead cows, but the district court sustained foundation objections. Additionally, 15 photographs of Burnett's property showing how the hailstorm "played out in the area," were not received because Burnett had failed to disclose the evidence prior to trial. Burnett conceded that he was responsible for reporting death loss to Fleecs per their agreement and stated that he "let Mr. Fleecs know about it the best I could." Burnett testified that he informed Fleecs of the bad storms, but he had not presented any of the offered photographs to Fleecs at the time.

Burnett stated that he buried or hauled the dead cattle away following the storms and described where on his property he disposed of the remains. Burnett was again unable to state how many dead cows were in each of the burial sites. Subsequent inspections of Burnett's property failed to uncover evidence of the buried and deceased cattle Burnett described. Fleecs testified that during an inspection in December 2021 on Burnett's property, he found only six carcasses of deceased cows and no evidence of the massive losses claimed by Burnett. A neighbor who spent a week in late 2021 driving throughout Burnett's property to install cameras and signs testified that he found three to five cattle carcasses.

Fleecs estimated that he was missing over 300 head of cattle that should have been in Burnett's possession.

(b) Lind and Burnett Agreement

Lind and Burnett entered into a lease agreement on January 5, 1999, which provided that Burnett would feed and care for Lind's cattle in exchange for a share of the calf crop. The agreement originally allowed Burnett to receive ⅔ of the calf crop but was later amended to allow Burnett 70 percent of the calf crop.

The lease agreement also required Burnett to brand the calves with his brand in the spring and to ear tag Lind's calves separately for identification. At trial, Burnett testified that he branded Lind's calves using his LV brand, consistent with the terms of the agreement with Lind. After the spring calves were weaned, Lind would take his share of the calf crop to his property and rebrand them with his brand. Lind would breed the cows and return them to Burnett in February or March when the cows were ready to give birth.

Burnett and Lind met once per year to discuss the cattle numbers. Lind admitted that he did not keep good records relating to his cattle in Burnett's possession. Occasionally, Burnett's and Lind's numbers were off by one or two heads, but Lind was unconcerned by such a minimal discrepancy.

During these annual meetings, Burnett would also inform Lind of any cows that were open (not pregnant) or dead. Burnett usually sold the open cows at a sale barn and would do so under the name of Lind's trust. Lind was unaware of any time in which Burnett sold one of his cows under Burnett's own name, though he conceded that Burnett doing so could have been possible without Lind's knowledge. Lind's usual process from 1999 until 2017 was to replace those cows that died or were sold, and occasionally add a few more, to maintain or expand the herd every year.

Lind delivered bred cows to Burnett in 2017 and believed there were 114 cows in the herd. Lind received 32 calves in both 2017 and 2018 as his 30 percent of the calf crop, and Lind expected

a similar amount the following year. Because of Fleecs' bailor's lien on Burnett's LV brand, which was used to brand Lind's calves as well, Burnett did not deliver any of Lind's share of the calf crop to him in 2019. In 2020 Burnett delivered just 14 calves pursuant to an agreement between the parties. Lind terminated his lease agreement with Burnett in 2020.

The lease agreement required Burnett to reimburse Lind, at fair market value, for any loss in excess of 5 percent of the increase of cows, arising from his fault, neglect, improper care, or the loss of cows for any reason whatsoever. If a death were to occur, the agreement required Burnett to cut off the brand of the dead cow and present it to Lind or provide a certificate from a veterinarian or rendering company verifying the brand of the dead cow. At the beginning of the lease agreement Burnett would prove death loss by photographs and phone calls, which Lind accepted. Burnett agreed that it was his practice to call Lind to report a dead cow to him.

In 2017, Burnett told Lind that his property was hit by a bad hailstorm but did not communicate that Lind's herd had suffered a massive loss. Again in 2018, Burnett told Lind that he had suffered a bad storm but did not state that any cattle were lost. Burnett also did not provide any proof of loss to Lind, including any photographs.

At trial, Burnett presented Lind with the photographs he sought to offer into evidence. Lind identified one of the cows in the photos as having a yellow ear tag, which Burnett had assigned for Lind's cows. Lind also noted that most of the photographed cows had no ear tag or other identification and that he had not seen the photographs prior to trial. When Burnett offered the photographs into the evidence the district court again sustained foundation objections.

Lind estimated that he was missing about 65 head of cattle that should have been in Burnett's possession.

### 3. DISTRICT COURT'S JUDGMENT

On November 23, 2022, the district court entered a judgment against Burnett. As to Burnett's agreements with Fleecs, the court found that Burnett breached his duties by not branding Fleecs' calves with Fleecs' brand, by not delivering most of Fleecs' cows to Fleecs' property at the termination of the agreement, by not showing proof of the cattle deaths, and by not properly maintaining Fleecs' cows as evidenced by his inability to provide a reasonable explanation for the disappearance of Fleecs' cattle. The court also found that Burnett's testimony regarding the cattle death was not believable and that his "failure to take a single photo of the enormous loss he claims is incomprehensible, inexplicable, and highly suspicious."

As to Burnett's agreement with Lind, the district court found that Burnett breached his duties by not providing proof of death loss, by not separately tagging Lind's calves, by not properly caring for the cows and not reimbursing Lind for death or loss per the terms of the agreement, by not providing reasonable care of Lind's cattle as he could not account for the loss of 54 head of cattle, and by not truthfully reporting to Lind as to the conditions of Lind's cattle.

The district court observed that due to Burnett's gross mismanagement, improper care, or improper transfer of the cattle, Fleecs and Lind had suffered damages. The court entered judgment against Burnett in favor of Fleecs' breach and replevin claims in the amount of $851,432.50, and against Burnett in favor of Lind's breach claim in the amount of $127,475.

The district court denied Burnett's December 2020 motion which requested compensation for the care of the eight heifers that remained on his property, finding that it was unclear from the

record how long Burnett had cared for the cattle and any evidence submitted by Burnett relating to the cost of the care was insufficient.

Finally, the district court found that the UCC financing statements filed by Fleecs and Burnett were improperly filed and were invalid, and it terminated the statements. The court dismissed Burnett's slander of title claim as he failed to provide sufficient proof of damages directly related to his claim.

Burnett appeals.

## III. ASSIGNMENTS OF ERROR

Burnett assigns that the district court erred in (1) entering a judgment in favor of both Fleecs and Lind; (2) determining that Burnett had not established a tortious interference claim; (3) determining that Burnett had not established a slander of title claim; (4) determining that Burnett was not entitled to damages or compensation for his care and feeding of the Fleecs and Lind cattle; and (5) allowing Burnett's trial counsel to withdraw.

## IV. STANDARD OF REVIEW

A suit for damages arising from breach of a contract presents an action at law. *Bloedorn Lumber Co. v. Nielson*, 300 Neb. 722, 915 N.W.2d 786 (2018). In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict and will not be disturbed on appeal unless clearly wrong. *Id*. In reviewing a judgment awarded in a bench trial of a law action, an appellate court does not reweigh evidence, but considers the evidence in the light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. *Id*.

## V. ANALYSIS

### 1. Judgment in Favor of Fleecs and Lind

Burnett first assigns that the district court erred in entering judgment in favor of both Fleecs and Lind. Burnett argues that the evidence at trial was insufficient to support the district court's findings that Burnett had improperly branded or otherwise identified the livestock and that Burnett had not proven the cattle losses he claims were caused by two significant weather events. Burnett additionally contends that the district court improperly excluded his photographic exhibits and erred in awarding damages to Fleecs and Lind, which were based on the court's assumptions.

#### (a) Branding Requirement

Fleecs' share cow agreement required that Burnett brand the heifer calves subject to the agreement in the spring season on their right side with Fleecs' brand. Burnett argues that Fleecs had concurred in the branding methods Burnett employed and that Fleecs had never taken any actions to enforce the strict contract terms for identifying the cattle. We disagree.

Burnett conceded that he began branding Fleecs' cattle with his LV brand in roughly 2014. The record shows that Fleecs objected multiple times to Burnett using his LV brand on Fleecs' calves and purchased a replacement brand for Burnett in December 2017 so that Burnett could properly brand the calves. Fleecs' August 2018 financing statement included cattle in Burnett's care with his LV brand because Fleecs was aware that Burnett was using his brand on Fleecs'

cows. Fleecs offered to remove his name from a proceeds check and contemplated terminating his financing statement if Burnett would rebrand the cows in accordance with their contract terms. Burnett never rebranded the cattle.

The evidence clearly supports the district court's factual finding that Burnett did not comply with the branding specifications contained in the share cow agreement despite numerous requests by Fleecs. The court did not err in finding that Burnett breached his cow share agreement with Fleecs by branding the cattle subject to the agreement with his own LV brand and not Fleecs' brand.

(b) Proof on Death Loss Requirement

Both Fleecs' share cow agreement and Lind's lease agreement with Burnett required Burnett to show proof of death loss in outlined methods. At trial, Fleecs and Lind each testified that they had varied the terms of their agreement by accepting photographs and phone calls from Burnett to prove death loss; methods not provided for in the governing agreements. The Nebraska Supreme Court has stated that the interpretation given to a contract by the parties themselves while engaged in the performance of it is one of the best indications of true intent and should be given great, if not controlling, influence. See *Linscott v. Shasteen*, 288 Neb. 276, 847 N.W.2d 283 (2014).

Both Fleecs and Lind testified that they were not made aware that they had suffered large death losses due to severe weather events. Fleecs testified that Burnett did not make him aware that he had been hit by a hailstorm until their annual meeting nearly a year later. And, according to Fleecs, Burnett only indicated that one of Fleecs' cows had been lost due to hail at that time. Burnett did not advise Fleecs that he lost any cattle after the 2017 weather event. Additionally, Burnett told Fleecs that his cattle were in Colorado after these severe weather events occurred. Lind testified that Burnett had called him to say he had been hit by two severe weather events, but Burnett did not advise that Lind's herd had suffered a massive loss. Neither Fleecs nor Lind received any photographs showing death loss after the weather events.

Though not explicitly argued, we interpret one of Burnett's arguments to be that the district court erred in finding that Burnett had the burden to prove the death losses were not caused by negligence and failed to do so by not properly photographing the dead cattle. In his brief, Burnett cites *Calland v. Nichols*, 30 Neb. 532, 46 N.W. 631 (1890), which holds that where cattle die while in the charge of an agister, who notifies the owner thereof, the burden of proof of negligence is on the owner.

The real issue before the district court was not what caused the alleged death loss of cattle, but whether the death losses claimed by Burnett actually occurred. The district court found that Burnett failed to establish the large-scale death losses which he claims accounts for the reduction in Fleecs' and Lind's herds. Burnett did not establish at trial that he notified the owners, Fleecs and Lind, of their cattle's substantial death loss. Burnett testified that he communicated to "the people" that his property had been hit by severe weather but did not testify as to how many cattle were killed or that he communicated the specific amount of death loss to either Fleecs or Lind. The district court found Burnett's testimony that the cattle had died in two storms to lack credibility. In a bench trial of an action at law, the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. An appellate court will not reevaluate the

credibility of witnesses or reweigh testimony but will review the evidence for clear error. *Weyh v. Gottsch*, 303 Neb. 280, 281, 929 N.W.2d 40, 43 (2019).

The district court also found that Burnett's "failure to take a single photo of the enormous loss he claims is incomprehensible, inexplicable, and highly suspicious." Although not specifically assigned as error, Burnett argues that the district court erred by refusing to receive his photographic exhibits, which presumably would have shown the death losses to Fleecs' and Lind's cattle. Burnett offered several sets of photographs depicting single dead cows and his property after the 2017 hailstorm.

The exhibits depicting single dead cows were not received over foundation objections by Fleecs and Lind. At trial Burnett testified that he took the photographs but did not state when he took the photographs, where specifically he took the photographs, or whether the photographs had ever been presented to Fleecs or Lind prior to trial. Additionally, Lind testified that many of the cows pictured did not have ear tags or other identifying features, thus making it unclear who the dead cows belonged to. A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion. *Elbert v. Young*, 312 Neb. 58, 977 N.W.2d 892 (2022). The district court did not err in sustaining the foundation objections.

Regarding the photos depicting Burnett's property after the hailstorm, Lind objected because "there was discovery done between the parties, and everything was asked to be turned over, and now all of a sudden, we get pictures. And so that's my objection: It was not prior disclosed." Fleecs then joined in Linds's objection. Burnett did not dispute that he did not previously disclose the photographs. Burnett does not argue on appeal that the photographs showing hailstorm damage were not subject to the parties' discovery process, nor did Burnett include his exhibit list in our record. Based on the record before we cannot say the district court erred in sustaining objections to the photographs due to Burnett's lack of disclosure.

Burnett did not provide any evidence that two severe storms caused massive death loss to both Fleecs' and Lind's cattle or that he communicated those losses to the owners aside from his own testimony, which the district court found not to be believable. Thus, the district court did not err in finding that Burnett breached his share cow agreement with Fleecs and his lease agreement with Lind by not providing proof of death loss as required by the agreements.

### (c) Award of Damages

Burnett argues that the district court erred in its damage awards to Fleecs and Lind, however, he provides no argument other than the conclusory statement that "the trial court's calculations added assumption to assumption in arriving at its damage awards." Brief for appellant at 20. An alleged error must be both specifically assigned and specifically argued in brief of party asserting error to be considered by appellate court. See *AVG Partners I v. Genesis Health Clubs*, 307 Neb. 47, 948 N.W.2d 212 (2020). We do not consider this alleged error further.

### 2. BURNETT'S TORTIOUS INTERFERENCE CLAIM

Burnett next assigns that the district court erred in its determination that Burnett had not established a claim for tortious interference. However, as noted above, the record does not contain any ruling on Burnett's motion to amend his counterclaim to include this claim and the amended

counterclaim was never filed. Accordingly, the district court's judgment did not address Burnett's tortious interference claim and we need not address it further. An appellate court will not consider an issue on appeal that was not presented to or passed upon by the trial court. *de Vries v. L & L Custom Builders*, 310 Neb. 543, 968 N.W.2d 64 (2021).

### 3. BURNETT'S SLANDER OF TITLE CLAIM

Burnett assigns that the district court erred in its determination that he had not established a claim of slander of title. Burnett argues that the difficulties with Lind's 2019 calf crop were precipitated by Fleecs' 2018 UCC financing statement, which Burnett contends Fleecs filed in haste and without investigation. Burnett asserts that Fleecs knew that his financing statement was inaccurate and overbroad.

An action for slander of title is based upon a false and malicious statement, oral or written, which disparages a person's title to real or personal property and results in special damage. *Wilson v. Fieldgrove*, 280 Neb. 548, 787 N.W.2d 707 (2010).

In its judgment the district court found that when Fleecs filed his initial UCC financing statement, he was unaware that Lind had ownership of calves with the LV brand and that Fleecs "was not acting in bad faith in regard to Lind." While the district court did not specifically address whether Fleecs' UCC financing statement amounted to a false statement with regard to the Lind cattle with the LV brand, these findings would seem to support such a conclusion.

In denying Burnett's (and Fleecs') slander of title claims, the district court found that neither party provided sufficient proof of damages directly related to such claims. We find no clear error in the district court's factual findings. The district court did not err in dismissing Burnett's slander of title claim.

### 4. BURNETT'S DAMAGES AND COMPENSATION

Burnett assigns that the district court erred in its determination that he was not entitled to compensation for his care and feeding of the Fleecs and Lind cattle. Burnett claims that both Fleecs and Lind had cattle on his property after the filing of his agister's lien in April 2019. Burnett argues that because he perfected his agister's lien, pursuant to Neb. Rev. Stat. § 54-201 (Reissue 2021), he is "entitled to compensation for the periods of time during which he continued to care for the Fleecs and Lind cattle." Brief for appellant at 23.

### (a) Compensation for Fleecs Cattle

In April 2019, Burnett filed an agister's lien against Fleecs in the amount of $906,400 for the care of the Fleecs cattle. An agister may claim a reasonable value of feed and care in cases where no contract price was agreed upon. See § 54-201. However, the share cow agreement in this case specifically stated that Burnett would receive 70 percent of the calf crop as compensation for the care and feeding of the cattle. The heifer calf agreement stated that Burnett would receive all of the first two calf crops as compensation for care and feeding of the calves. The contract price had been established by Fleecs and Burnett, and the agreements provided that Burnett was responsible for the expenses relating to the care of the cattle.

Moreover, as the district court noted in its judgment, § 54-201 requires that any financing statement filed to perfect an agricultural lien shall be filed prior to removal of such livestock from

the premises of the person, firm, corporation, partnership, or limited liability company entitled to a lien. See § 54-201. Burnett did not establish that he was in possession of the Fleecs cattle at the time he filed his agister's lien. In 2018, Burnett told Fleecs his cows were in Colorado. Later, he claimed he lost large numbers of cattle in 2017 and 2018 due to extreme weather events that occurred in Nebraska. It is inconsistent for Burnett to claim he is owed $906,400 for care and feeding when he also maintained the cows were not on his property or were deceased.

In Burnett's written argument following trial, he also requested that the district court award him a judgment of $14,000 for the care and feeding of the Fleecs cattle after the time Fleecs had terminated the parties' agreement until the cattle were removed from Burnett's property. Burnett did not raise this request until after the trial had concluded and he provided no evidence at trial which demonstrated how long the Fleecs cattle were in Burnett's possession after their agreements were terminated, how many of Fleecs' cattle were in Burnett's care, or how Burnett calculated the $14,000 amount he should be paid for the care. The district court in its judgment addressed only Burnett's claim for $906,400. A trial court cannot err in failing to decide an issue not raised, and an appellate court will not consider an issue for the first time on appeal that was not presented to or passed upon by the trial court. *Vande Guchte v. Kort*, 13 Neb. App. 875, 703 N.W.2d 611 (2005). To the extent that Burnett appeals the district court's failure to award him $14,000 in compensation, we decline to address the issue further.

Burnett was not entitled to file a UCC financing statement and claim an agister's lien because he had entered agreements with Fleecs that compensated Burnett by shares of calf crops. Burnett was also unable to show that he was in possession of the Fleecs cattle at the time the financing statement was filed. As such, Burnett is not entitled to monetary compensation for the care of Fleecs' cattle.

(b) Compensation for Lind Cattle

We note that Burnett's April 2019 agister's lien names only Fleecs as a debtor. Lind is not named in Burnett's agister's lien and our review of the record reflects that Burnett did not state a claim for monetary damages for the care of Lind's cattle in any answer, counterclaim, or motion. Only in Burnett's written argument following trial did he claim that Lind owes Burnett "a feed bill of $8,500.00 for winter and summer care and feed," and further request that the district court award Burnett a judgment of $8,500 for the care of Lind's 17 heifers until they were removed from Burnett's property.

Burnett did not raise the issue or present any evidence to support his claim for compensation for the care and feeding of the Lind cattle at trial. Burnett does not cite to any evidence in the record which demonstrates how long Lind's cattle were in his care after the parties terminated their agreements, the number of Lind's cattle in his care, or how Burnett calculated the $8,500 amount he should be paid for the care. Because Burnett did not properly present his claim for compensation related to the Lind cattle to the district court for determination, we do not address the assigned error. See *Vande Guchte v. Kort, supra* (appellate court will not consider issue for first time on appeal that was not presented to or passed upon by trial court).

## 5. WITHDRAWAL OF BURNETT'S COUNSEL

Finally, Burnett assigns that the district court erred in allowing his counsel to withdraw. Burnett argues that he "clearly objected to the withdrawal, and, due to the complexities of the cases, and as evidenced by difficulties encountered by Burnett with his evidence, was just as clearly prejudiced." Brief for appellant at 24.

No motions or orders related to the withdrawal of Burnett's counsel are included in our transcript and no recording of any hearings are included in our bill of exceptions. Burnett appears to raise the issue of his trial counsel's withdrawal for the first time in his brief on appeal. It is the appellant's burden to present a record to support the errors assigned, and in the absence of a complete bill of exceptions, it is presumed that an issue of fact raised by the pleadings was sustained by the evidence and that it was correctly determined. *In re Estate of Baer*, 273 Neb. 969, 735 N.W.2d 394 (2007). A party's brief may not expand the evidentiary record. *Id.*

Based on the record before us, there is no support for Burnett's argument that he was prejudiced by his counsel's withdrawal. We thus presume that the district court did not abuse its discretion in allowing Burnett's counsel to withdraw. This assignment of error fails.

## VI. CONCLUSION

The district court did not err in finding that Burnett breached his agreements with Fleecs and Lind by failing to brand their cattle and prove death loss as required by their respective agreements. Burnett has failed to present evidence establishing his tortious interference claim, slander of title claim, entitlement to an award of damages, or that the district court erred in allowing his trial counsel to withdraw. We affirm the judgments against Burnett.

AFFIRMED.